IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF SOUTH CAROLINA

| | | |
|---|---|---|
| Sterling L. Singleton, #2339777, | ) | CIVIL ACTION NO. 9:15-2723-JMC-BM |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **REPORT AND RECOMMENDATION** |
| | ) | |
| Patricia Brown, Lieutenant, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

This action has been filed by the Plaintiff, pro se, pursuant to 42 U.S.C. § 1983. Plaintiff, an inmate with the South Carolina Department of Corrections (SCDC), alleges violations of his constitutional rights by the named Defendant.

The Defendant filed a motion for summary judgment pursuant to Rule 56, Fed.R.Civ.P., on April 26, 2016. As the Plaintiff is proceeding pro se, a Roseboro order was entered by the Court on April 28, 2016, advising Plaintiff of the importance of a motion for summary judgment and of the need for him to file an adequate response. Plaintiff was specifically advised that if he failed to respond adequately, the Defendant's motion may be granted, thereby ending his case. After receiving several extensions of time, Plaintiff filed a response in opposition to the Defendant's motion on July 5, 2016, to which the Defendant filed a reply memorandum on July 29, 2016.

The Defendant's motion is now before the Court for disposition.[1]

---

[1] This case was automatically referred to the undersigned United States Magistrate Judge for (continued...)



## Background and Evidence

Plaintiff alleges in his verified Complaint[2] that on July 29, 2913, while he was housed in a maximum security cell in the Special Management Unit (SMU) at the Lieber Correctional Institution (LCI) under "crisis intervention", he was given a jumpsuit and escorted to see the psychologist/counselor. Plaintiff alleges that when he was being escorted back to his cell the officer asked him why he was on crisis intervention, and Plaintiff answered that it was because he would not eat due to a dispute he was having with medical about his "medical necessities". Plaintiff alleges he asked the officer if he could "hold the jumpsuit" until the officer came back with his "C.I. blanket", to which the officer stated "hold up and don't do anything crazy" and then left.

Plaintiff alleges that a few minutes later the Defendant Patricia Brown (a Lieutenant) approached his cell and asked him "in an angry tone" why he still had the jumpsuit. Plaintiff alleges that when he began explaining the situation to Brown, "without warning Brown opened my food servs. flap and administered an extremely long burst of chemical munitions . . . ." Plaintiff alleges this caused him to experience "intense pain and suffering" - that his skin and eyes were burning and that he "couldn't breathe". Plaintiff alleges that in an attempt to avoid further assault he ran to the back of his cell, but that Brown continued to administer "several long bursts" of chemical munitions into the cell. Plaintiff alleges that Brown then stopped, said something derogatory to him, and left,

---

[1](...continued)
all pretrial proceedings pursuant to the provisions of 28 U.S.C. § 636(b)(1)(A) and (B) and Local Rule 73.02(B)(2)(d) and (e), D.S.C. The Defendant has filed a motion for summary judgment. As this motion is dispositive, this Report and Recommendation is entered for review by the Court.

[2]In this Circuit, verified complaints by pro se litigants are to be considered as affidavits and may, standing alone, defeat a motion for summary judgment when the allegations contained therein are based on personal knowledge. Williams v. Griffin, 952 F.2d 820, 823 (4th Cir. 1991).



but about ten to fifteen minutes later she returned and "reopened my flap and gassed me numerous times again".

Plaintiff alleges that he never refused to obey any direct/lawful orders, he was not being disrespectful or using foul language, he was not attempting to throw any substance or destroy any SCDC property, and was not attempting to harm himself or that could have been construed as threatening. Plaintiff alleges that after the second time Brown had sprayed him with munitions, "minutes later" she returned with a Force Cell Movement Team (FCMT) and gave him a direct order to give her the jumpsuit, to which Plaintiff complied. Brown and the FCMT then left.

Plaintiff alleges that a few minutes later Brown then returned to his cell and told him that he was "going in the chair". Plaintiff alleges he "asked her for what because I didn't do anything and again asked for a shower", resulting in Brown returning a few moments later with the FCMT, who proceeded to "rush[ ] in tackle[ ] me to the concrete slab, restrain[ ] me to the concrete slab, restrain[ ] me drag[ ] me out of the cell naked across the contaminated . . . floor". Plaintiff alleges that he was then strapped into the "restraint chair" without any clothes and even though he was "covered with and burning from being tortured by the chemical munitions". Plaintiff alleges that he was "screaming in agony begging for a shower and medical attention, but that he was left in the restraint chair for approximately six and a half hours while the "gas was burning" and the restraints were "cutting into my skin". Plaintiff alleges when he was finally released from the restraint chair he asked if he could have a shower and if they would fumigate his cell, but that the officers were told by Brown "not to do so". Plaintiff alleges he never got a shower, nor was his cell ever cleaned out.

Plaintiff seeks monetary damages for violations of his constitutional rights by the Defendant. Plaintiff has also attached copies of several grievance forms to his Complaint. See



generally, Plaintiff's Verified Complaint, with attached Exhibits.

     In support of summary judgment in this case, the Defendant Patricia Brown has submitted an affidavit wherein she attests that during the time period relevant to Plaintiff's claim she was a Lieutenant with the SCDC, and was a supervisor in the dorm where Plaintiff was housed. Brown has attached copies of numerous Incident Reports, together with a CD containing video recordings taken of the events of July 29, 2013.

     Brown attests that at approximately 8:45 a.m. she went to the door of Plaintiff's room after being informed by another officer that Plaintiff was in possession of a jumpsuit. Brown attests that Plaintiff was on crisis intervention and was not allowed to have a jumpsuit or any other personal belongings in his room. Brown attests that Plaintiff refused to provide the jumpsuit, so she administered "2 small bursts of chemical munitions", totaling about 36 grams. Brown attests that she administered the chemical munitions in a reasonable effort to gain Plaintiff's compliance with her lawful and reasonable directives to return the jumpsuit, but that Plaintiff still refused to provide the jumpsuit. An FCMT was therefore assembled to retrieve the jumpsuit. However, when they approached Plaintiff's door at approximately 9:30 a.m., Plaintiff gave up the jumpsuit when directed to do so. See also attached Exhibits A and B (Incident Reports), and Video 1 of Exhibit G.

     Brown attests that at approximately 10:55 a.m. she was informed by the control room that Plaintiff had placed something over the camera in his room. An FCMT was again formed, went to Plaintiff's room, and Plaintiff was directed to come to the door and be handcuffed. Plaintiff refused, and a "very short burst" of chemical munitions were deployed to gain Plaintiff's compliance (by another officer, not Brown) totaling 28 grams. The FCMT then entered Plaintiff's room and restrained him. Brown attests that during this incident Plaintiff punched Officer Gilliard in the face



with the handcuffs that were cuffed to his right arm, as a result of which Plaintiff was charged with assaulting an SCDC employee. Brown attests that after Plaintiff was restrained he was removed from his room and placed in the open common area of the dorm while his room was cleaned, following which Plaintiff was placed back into his room. Brown attests that after Plaintiff is placed back in his room, he can be seen on the video decontaminating himself by wiping his eyes with a piece of paper towel or toilet paper. See also attached Exhibits C and D (Incident Reports), and Video 2 of Exhibit G. Nurse Herald then checked on the Plaintiff after the cell extraction. See also Video 3 of attached Exhibit G.

Brown attests that after she was informed that Gilliard had been hit in the mouth with a handcuff by the Plaintiff, Warden McFadden was contacted, who gave approval to place Plaintiff in the restraint chair. Brown attests that another FCMT was assembled, and the Plaintiff was placed in the restraint chair without incident. Brown attests that Nurse Herald was present during the entire cell extraction and chair placement, and that she checked Plaintiff's restraints and indicated they were fine. See also attached Exhibit E (Incident Report), and Video 4 of Exhibit G.

Finally, Brown attests that at approximately 6:30 p.m. an FCMT was assembled to remove Plaintiff from the restraint chair and place him back in his room. Brown attests that it is necessary to have a full FCMT to remove an inmate from the restraint chair, and that this was the earliest that Plaintiff could be removed from the restraint chair as a full team could not be assembled prior to that time due to staffing issues. Brown attests that after Plaintiff's restraints were removed, he walked back to his room, during which Plaintiff was both yelling and singing. Brown further attests that a nurse was present during the entire time, and that after Plaintiff was back in his cell he can be observed on the video jumping up and down in his room. See also Video 5 of Exhibit G.



Brown attests that pursuant to SCDC policy, chemical munitions can be used to prevent and/or control disruptive behavior, and that from her observations Plaintiff was not harmed in any way as a result of these events. Brown attests that following the use of chemical munitions, inmates are allowed to decontaminate using water in their cells, and that Plaintiff had running water in his cell at all times relevant to the incidents described and also had toilet paper in his room. Brown attests that Plaintiff had an opportunity to decontaminate himself in his cell after chemical munitions were deployed on both occasions, including at least thirty minutes to decontaminate himself before he was placed in the restraint chair. Brown further attests that in addition to Plaintiff being able to decontaminate himself, his room would have decontaminated during the time he was in the restraint chair, during which Plaintiff's door remained open.

Brown attests that she did not use chemical munitions on July 29, 2013 other than as stated in her affidavit, that the only force she used was that force reasonable and necessary to maintain discipline and to attempt to gain Plaintiff's compliance with lawful directives, and that she used the minimum reasonable force necessary to gain control of the Plaintiff and to ensure institutional security and good order. See generally, Brown Affidavit, with attached Exhibits.

In conjunction with review of the Incident Reports attached to Brown's affidavit (which reflect the facts as stated by Brown in her affidavit), the undersigned has reviewed the video tape evidence provided, which consists of five separate video taped sessions. The first video is from approximately 9:30 a.m. on June 29, 2013, and begins by Brown making a statement and introducing the members of the FCMT, who have been assembled because Plaintiff has refused to give his jumpsuit to jail officials. The video then follows the team to Plaintiff's room door, where Plaintiff can be seen standing at the door. Plaintiff was asked to hand over the jumpsuit, and he does so



through the food flap on the cell door.  Plaintiff does not appear on the video tape to be in any distress, and no force is used in this incident.

The second video begins at approximately 11:00 a.m., again with Brown introducing herself and the members of the FCMT.  Brown states that Plaintiff has covered up the camera in his cell with toilet paper.  The video then follows the team to Plaintiff's cell door, where he is asked several times to come to the door and be cuffed.  Plaintiff does not comply.  The video then shows an officer shooting a short burst of munitions into the cell through the food flap, following which Plaintiff is again asked to come forward and be handcuffed.  Plaintiff again refuses, while yelling and cursing at the officers.  The cell door is then opened and the team rushes in to subdue the Plaintiff.  The video does not appear to show any officer hitting or striking the Plaintiff, but they are holding him down and restraining him (apparently while being handcuffed).  The team members then pick the Plaintiff up and carry him out of the cell, all while Plaintiff is yelling and cursing at them.  Plaintiff is then laid on the floor outside of his cell while an officer can be seen sweeping out Plaintiff's cell in the background.  Plaintiff again does not appear to be in any distress, and even starts singing while he is lying on the floor.  After the cell is cleaned, Plaintiff is carried back into the cell, and the restraints are removed.  Again, no hitting or striking of the Plaintiff is observed on the video.  After the door to the cell is closed, Plaintiff is observed standing up at the door.  In Video 3 a nurse is outside the cell door and states into the camera that Plaintiff appears to be okay.  Plaintiff is again seen in the background, standing at the door of the cell.

The next video is from approximately 11:47 a.m., and begins with Brown announcing that an FCMT had been assembled to take Plaintiff out of his cell to the restraint chair for having struck an officer.  Brown and the extraction team then proceed to Plaintiff's cell, where he is asked



to turn around and be cuffed.  Plaintiff refuses to do so despite repeated requests.  The cell doors are then opened and the extraction team goes in, secures the Plaintiff, and takes him out.  There is no hitting, striking or undue violence reflected on the video.  There does not appear to be anything wrong with the Plaintiff - he is observed talking and cursing, and at one point starts singing again as he is taken down the hall.  As Plaintiff is placed in the restraint chair, he starts to complain that his constitutional rights are being violated.  At one point he says his leg is hurting him, so the officer offers to move the leg irons.  Plaintiff is seated with a towel draped over him.  Although Plaintiff keeps yelling and cursing, there is no resisting and no violence shown on the video tape.  Although the conversation is difficult to make out, at one point Plaintiff appears to threaten retaliation if the officers "come at me".  Plaintiff also appears to attempt to head butt an officer who is close to him.  Plaintiff then starts to generally complain that he has a bad back and other medical conditions, and about something being on his nose.  Plaintiff appears to have some type of netting placed over his head, apparently to protect the prison guards from being spit on.  Plaintiff again starts talking to the officers and cursing, saying he is going to sue them.  At one point Plaintiff is complaining about having trouble breathing, although he does not appear to be having any problems, and at one point even starts laughing.  Plaintiff also instructs the officers that they are supposed to be able to put two fingers between his leg and his shackle, and the nurse appears to be confirming the looseness/tightness of his shackles.  The nurse then tries to give a report on the Plaintiff's condition on the camera, but it is hard to hear her due to the Plaintiff yelling the entire time in the background.  At one point Plaintiff can be heard to say "this isn't as bad as I thought it was", and then laughs.  At the end of the tape the nurse appears on camera stating that Plaintiff is okay.

The final video is from approximately 6:30 p.m. that day, when the officers come to



take Plaintiff out of the restraint chair and take him back to his cell. Plaintiff is talking and does not appear to be in any distress. At one point he asks one of the officers what time it is, and then complains that he should have only been in the restraint chair for about four hours. Plaintiff continues talking to the officers as they take his restraints off (mostly inaudible), and then he starts singing again. Plaintiff gets up and walks back to his cell without incident, singing all the way and holding his blanket. However, once he is placed back in his cell, he starts yelling and cursing at the officers again. Plaintiff can then be seen jumping up and down at the cell door, yelling at and taunting the officers. A nurse is shown going to the cell door to ask the Plaintiff if he is okay, and also tells him that she will come back and check on him again later. The nurse then turns to the video and states that the Plaintiff is okay, which is the end of the video. See generally, Defendant's Exhibit G.

        The Defendants have also submitted an affidavit from Joseph McFadden, who attests that he is the Warden at the Lieber Correctional Institution. McFadden attests that Plaintiff was transferred to LCI on June 28, 2013 from the McCormick Correctional Institution, where he had been held in the Special Management Unit (SMU). McFadden attests that Plaintiff has a long history of multiple institutional disciplinary convictions for offenses ranging from threatening to inflict harm on employees, possession of contraband, assault and/or battery of an SCDC employee, throwing substances, striking an inmate, striking an SCDC employee, refusing or failing to obey legitimate orders from SCDC employees, use of obscene or vulgar language or gestures, and possession of weapons. McFadden attests that Plaintiff was housed in the SMU at LCI, which is the high security and most secure area at the Institution. McFadden attests that the SMU houses inmates who present higher security risks than inmates in the general population, generally due to disciplinary problems



or assaultive or violent behavior.

McFadden attests that on July 29, 2013 he was informed that Plaintiff had assaulted an SCDC officer (Officer Gilliard) during a cell extraction. McFadden attests that Plaintiff also continued to place paper on the camera in his room and he was an imminent threat to himself and the safety of officers, who would have to go in and remove the paper from the camera. McFadden attests that he therefore approved Plaintiff's placement in the restraint chair. McFadden also attests that while inmates receive showers on scheduled shower days when they are in compliance with the rules and are not on controlled cell status, that inmates can decontaminate using water in their cells if they are subjected to chemical munitions.

McFadden attests that as a result of striking an employee during the cell extraction on July 29, 2013, Plaintiff was charged with assault and battery of an employee (Offense No. 801), and was thereafter convicted following a hearing of striking an employee (Offense No. 807). McFadden has attached to his affidavit a copy of the Incident Report prepared by Officer Gilliard and dated July 29, 2013, a computer printout from the SCDC Offender Management System showing the charge made against the Plaintiff and Plaintiff's conviction for striking Gilliard on July 29, 2013, as well as the Disciplinary Report and Hearing record showing that Plaintiff was convicted of the offense of striking an officer. McFadden attests that Plaintiff has not appealed the conviction or the sanctions imposed as a result of this conviction. See generally, McFadden Affidavit, with attached Exhibits.

The Defendants have also submitted an affidavit from LuAnne Mauney, who attests that she is Nurse Supervisor at LCI. Mauney has attached to her affidavit a copy of Plaintiff's medical records while housed at LCI, including the medical care and treatment he received on July



29, 2013. Mauney attests that Plaintiff's medical records show that he was seen by medical staff on numerous occasions on July 29, 2013, including after Plaintiff underwent a cell extraction with resistance between 10:30 a.m. and 11:00 a.m. that required the use of chemical munitions. Mauney attests that after the cell extraction, Plaintiff was evaluated and determined to be in no respiratory distress. There was also a nurse present when Plaintiff was extracted and taken for placement in the restraint chair at around 11:45 a.m. The attached medical records reflect that Plaintiff was seen and evaluated by medical personnel four different times on July 29, 2013. See generally, Mauney Affidavit, with attached Exhibit.

The Defendant has also provided an affidavit from Michelle White, who attests that she is an Inmate Grievance Administrator with the Department of Corrections. White attests that under the inmate grievance procedure, an inmate must first attempt to resolve an issue through an informal resolution by submitting a Request to Staff Member form. This is followed by submission of a Step 1 grievance, and if the inmate is not satisfied with the response to his Step 1 grievance, he must then appeal that response by submitting a Step 2 grievance appeal form. White further attests that if an inmate's Step 1 grievance is returned to the inmate, the inmate will have the opportunity to either refile a proper grievance, or the inmate can appeal the returned grievance. However, an inmate is allowed to submit only one grievance per incident or circumstance.

White attests that she has attached to her affidavit copies of the Inmate Grievance form submitted by the Plaintiff concerning the matters he raises in his Complaint. White attests that Step 1 grievance form (LCI-1529-13) was received on October 23, 2013, and after this grievance was denied, Plaintiff filed a Step 2 grievance appeal on February 11, 2014, which was denied on January 7, 2015. Defendant does not dispute that this grievance was exhausted.



Plaintiff also submitted a Step 1 grievance form (LCI-1574-13) on November 6, 2013, which was returned to the Plaintiff unprocessed since it was determined to be "a duplicate to issues raised in LCI-1529-13". White attests that Plaintiff did not appeal this returned grievance by submitting an SCDC form 19-11, Request to Staff Member form, or ARTSM, and that Plaintiff has therefore never received a final agency decision concerning the matters raised in Grievance LCI 1574-13. See generally, White Affidavit, with attached Exhibits (grievance forms).

Finally, the Defendant has submitted a copy of an Incident Report dated January 29, 2013 from Officer Samuel Howell. In this Incident Report, Howell states that he was a member of the FCMT that removed Plaintiff out of his cell so that trash could be taken off of his camera, that Plaintiff refused to come to the door, and that when they then entered the room Plaintiff "continued to fight back throwing punches and kicking". This Incident Report further states that after Plaintiff was removed from the cell, the "room was cleaned out", following which Plaintiff was placed back in his cell. See Incident Report (Defendant's Exhibit 5).

In opposition to the Defendant's motion for summary judgment Plaintiff has submitted numerous exhibits with his brief. Included among these exhibits are several inmate affidavits. Inmate Anthony Briggs attests that on July 29, 2013 he was housed in a cell four cells down from the Plaintiff. Briggs attests that he never heard Singleton making or creating any disturbances, nor from his observation did Plaintiff do anything that could be construed as destructive or threatening. Briggs attests that he observed the Defendant Brown approach Plaintiff's door and ask about a jumpsuit officers had given him, and that "seconds later" she opened his food service flap and administered "several long bursts" of pepper spray. Briggs attests that Brown then left and returned "multiple times, opening his flap and administering chemical munitions . . . into



his cell", all while yelling at the Plaintiff. Briggs attests that Brown then left and returned with the FCMT, and that when she gave Plaintiff a directive to give her the jumpsuit, Plaintiff complied. However, Briggs attests that "moments later" the officers returned and then he saw Corporal Williams "dragging [Plaintiff] out of the cell". Briggs attests that Plaintiff was naked, and that Williams had a leash that was attached to some handcuffs. Briggs attests that the officers went into Plaintiff's cell and came back out a few seconds later, at which time Williams "drug [Plaintiff] back into the cell".

Briggs attests that Brown later returned to Plaintiff's cell with Plaintiff's counselor (Sherisse Birch), who asked Plaintiff "what was going on with him". Briggs attests that the Plaintiff asked Birch where his blanket was, and that Birch and Brown then walked off, leaving the wing. Briggs attests that Brown came back "moments later" and told Plaintiff that he was going to the restraint chair, and that he heard Plaintiff tell Brown that he needed a shower "to wash the gas off because it was burning", and that he also needed to clean his cell. Briggs attests that Brown ignored Plaintiff's "pleas", and that no medical personnel ever came to assess Plaintiff's condition at that time.

Briggs attests that Brown then returned with the FCMT, and that he then saw Williams "dragging [Plaintiff] in the same manner as before". Briggs further attests that he saw Williams "forcefully placing the restraints on [Plaintiff] and jerking them tight". Briggs attests that he "repeatedly heard" Plaintiff screaming about the restraints and about his various medical conditions, as well as that the gas was burning him. Briggs attests that after restraining the Plaintiff, they simply "walked off the wing leaving [Plaintiff] screaming and yelling in pain". Briggs further attests that Plaintiff repeatedly asked "Officer Johnson" who was working the booth that day to call



medical and the Defendant Brown, but that no one ever came.

Briggs attests that approximately 6:00 p.m. he heard Plaintiff ask "Sgt. James Jones" to please open his cell and let the gas air out and also if he could get a shower because the gas was burning him. Briggs attests that Jones said he would check on the shower and was about to open up Plaintiff's door when someone (Briggs assumes it was Lt. Brown) screamed at Jones from the sally port area, and Jones then left the Unit. Briggs attests that moments later Brown and the Force Team Officers came to take Plaintiff back to his cell. Briggs attests he heard Plaintiff talking to the nurse, and then he heard Brown say "lets go" and then they all left. Briggs attests that Plaintiff was never given a shower and his cell was never cleaned and/or decontaminated. See generally, Briggs Affidavit.

Inmate Davis Bacchus attests in an affidavit that he was in a cell approximately eleven cells away from where Plaintiff was housed. Bacchus attests that on July 29, 2013, he observed the Defendant Brown go to Plaintiff's cell and overheard her say something about a jumpsuit. Bacchus attests that Brown then opened Plaintiff's food flap and "gassed him several times" before leaving the wing. Bacchus attests that he heard Plaintiff screaming that the gas was burning his eyes and skin, and "something about letting him take a shower". Bacchus attests that about twenty minutes later, Brown opened Plaintiff's flap again and gassed him again while screaming at him.

Bacchus attests that when Brown came back she had the extraction team with her and they went into Plaintiff's room. Bacchus attests that after they came out he saw Officer Williams "dragging the Plaintiff by a leash on the floor naked, while he was in handcuffs and leg irons". Bacchus also attests that as Plaintiff was being placed in the restraint chair, he could hear him telling



the nurse and the officers about his medical conditions and that his handcuffs were too tight and that he was having trouble breathing.  Bacchus also attests that Plaintiff was yelling that the gas was "burning him real bad".  Bacchus attests that after strapping him to the restraint chair, the nurses and the officers left, but that he could hear Plaintiff repeatedly holler out to call medical about the gas burning him and about his handcuffs and leg irons being too tights.  Bacchus attests that he asked "Ms. Johnson" to call Brown about getting Plaintiff out of the chair after he had been in the chair about four hours, and that Plaintiff also asked Sgt. Jones to open the cell door to let it air out, but that as Jones walked to Plaintiff's cell door Brown said something to him and he left.  See generally, Bacchus Affidavit.

Inmate James Darnell Scott attests in an affidavit that he was housed on the B-wing of the SMU on July 29, 2013 and that he could hear "chemical munitions being sprayed multiple times in approximately 10-15 minute intervals".  Scott attests that he then heard inmates yell that a Force Cell Movement Team was coming, and that was when he saw the Plaintiff being placed in the restraint chair.  Scott attests that while Plaintiff was being placed in the restraint chair, he heard him complaining about having trouble breathing and about various medical conditions, as well as that the officers were putting the handcuffs on him too tight.  Scott attests that Plaintiff also repeatedly asked about what time it was, and that around 4:00 p.m. he heard Plaintiff ask Officer Johnson to call Brown to get him out of the restraint chair because his time was up.  Scott attests that when they finally took the Plaintiff out of the restraint chair, they placed him back in the cell where the chemical munitions had been sprayed, although no attempts to decontaminate that cell had been made.  See generally, Scott Affidavit.

Inmate Timothy Wright has submitted an affidavit wherein he attests that he was



laying in his bed reading on July 29, 2013, when he heard chemical munitions being sprayed "so I jumped out my bed to go to the door". Wright attests that he asked Plaintiff "was he okay", but got no answer. Wright attests that a few minutes later the Defendant and other SCDC employees returned to Plaintiff's cell and "started sprayin Plaintiff over and over". Wright attests that after about twenty to twenty five minutes, Plaintiff was placed in a restraint chair with no clothes on. Wright attests that while in the restraint chair, Plaintiff was yelling and screaming that the gas was burning his body and asking for medical attention, but that no one paid him any attention. Wright attests that Plaintiff was then returned to his room "after almost 7 to 8 hours" in the restraint chair. Wright attests that Plaintiff was "still yelling & screaming for medical attention while being placed back in his cell". Wright also attests that Plaintiff never had an opportunity to wash the gas off, and that he was neither given a shower nor anything to clean his room with. See <u>generally</u>, <u>Wright Affidavit</u>.

Inmate Christopher Lane has submitted an affidavit wherein he attests that on July 29, 2013 he heard a woman's voice that he later identified as the Defendant, and that although he could not hear specifically what she was saying, he could hear the "hostility in her voice", following which he heard a "big can of gas" sprayed several times. Lane also attests that he heard a "whole lot of commotion . . . on the other side of the wall" where he could not see. However, Lane attests that he did see the officers carry/drag Plaintiff up the steps to the restraint chair, during which he was naked and "in front of a couple of females". Lane further attests that when they were strapping Plaintiff into the restraint chair he was complaining about not being able to breathe and other medical problems and that his cuffs were too tight and were cutting off his circulation, but that "no one attempted to help him to my knowledge". Lane also attests that they "never cleaned his cell out



before they took him out of the chair", and never gave him a shower.  See generally, Bacchus Affidavit.

Supreme Ackbar has submitted a "Declaration" in which he states that he heard the Plaintiff "loudly express displeasure at being injustly strapped to a restraining chair . . . after being spray with a chemical agent . . . ."  Ackbar Declaration.

Plaintiff has also attached copies of his disciplinary records, various Incident Reports, copies of his grievance forms, copies of his Medical Summary reports (also submitted by the Defendant), a Request to Staff form, and an exhibit he captions "Chemical Munitions", which discusses the use and effects of chemical munitions.  Plaintiff has also submitted copies of Defendant's responses to various discovery requests.  See generally, Plaintiff's Exhibits.

Finally, the Defendant submitted two additional affidavits as attachments to her reply memorandum, one of which is from her.  The Defendant attests that there was a supply vent for mechanical air circulation in the cell occupied by the Plaintiff on July 29, 2013, and that at no time on that day was the air circulation turned off in Plaintiff's cell.  See generally, Defendant's Supplemental Affidavit.

The other affidavit is from Henry Urbshot, who attests that he is a Captain with the SCDC and works in the Employee Development Branch, Division of Training and Staff Development.  Urbshot attests that he is familiar with the different types of chemical munitions used by the SCDC, and that part of his job is to teach corrections officers the proper use of chemical munitions.  Urbshot attests that he is familiar with the specifications of chemical munitions, that he has been trained about their use and decontamination, and has attended seminars and has received training and instructions on the use of chemical munitions.  Urbshot attests that he received a Master



Instruction Certification for the use of chemical munitions in May 2007, and that during the course of this training he was himself given a Level 1 exposure (direct facial and respiratory contact) to OC chemical agents. Urbshot further attests that he has maintained his Master Instructor Certification by attending refresher courses in 2009, 2011, 2013, and 2015, and that with each refresher course he was re-exposed to OC chemical agents.

Urbshot attests that with respect to the administration of chemical munitions to the Plaintiff as alleged in his Complaint, the evidence shows that MK-non fogger was used, and that the Defendant states that she administered 36 grams of chemical munitions at approximately 8:45 a.m., and 26 grams of chemical munitions at approximately 10:55 a.m. Urbshot further notes that, according to the records, Plaintiff was wearing a jumpsuit during the first use of chemical munitions, and was not wearing clothing during the second use of chemical munitions, and that Plaintiff states he did not receive a shower after the use of chemical munitions and that his room was not decontaminated.

Urbshot attests that the type of chemical munitions used in this case is known as Oleoresin Capsicum (OC), which is also known as pepper spray. Urbshot attests that OC is made from a food product, peppers, comes from the oil of peppers, and is non-toxic. Urbshot attests that the aerosol fogger delivers OC in the air through an aerosol spray, much like Lysol, at which time the target will inhale the OC. Urbshot attests that although any direct target area may become moist to the touch, most of the spray will be in droplets suspended in the air until it dissipates. Urbshot attests that according to SCDC policy, after the use of chemical munitions an inmate is to be given access to cold running water, and that the information provided to him is that Plaintiff had running water available to him in his room at all times. Urbshot attests that there is no requirement that an



inmate be given a shower to decontaminate. Further, Urbshot attests that he is informed that the air circulation was turned on in Plaintiff's cell. Urbshot attests that based on his training and experience, running water from the sink in Plaintiff's room is adequate and proper to remove OC spray, and that running water would have certainly been adequate to remove the small amounts of spray involved in this case.

Urbshot attests that during the first use of chemical munitions at approximately 8:45 a.m., Plaintiff was wearing a jumpsuit. Therefore, the OC spray from the fogger would not have covered Plaintiff's body, and based on the small amount of spray used, likely would not have even contaminated the jumpsuit. Further, Plaintiff had the opportunity to wash off in the sink in his room after this event. With respect to the second use of chemical munitions at 10:55 a.m., Plaintiff was naked. However, Urbshot attests that although the OC spray may have made contact with Plaintiff's body, since only a very small amount of OC spray was used it is unlikely that Plaintiff's body suffered widespread exposure. Urbshot further attests that because it is an aerosol spray, the target area may have become mist and droplets would have been suspended in the air for a short period of time before dissipating but as Plaintiff had access to running water, he would have been able to rinse the spray from his body if necessary.

With respect to Plaintiff's room, Urbshot attests that based on his training and experience, OC aerosol spray will dissipate from the air, clothing, skin and other surfaces in a short period of time, and Plaintiff's room would therefore have been decontaminated upon his return from the restraint chair. Urbshot attests that based on his training and experience, this would be true whether the door to Plaintiff's room was open or closed, especially where there was air circulation in the room. With the ventilation system on, there was a constant flow of air movement in Plaintiff's



cell, and this, together with the time that Plaintiff was out of his cell and in the restraint chair, was more than ample time to dissipate any spray in the air.

With respect to the exhibit Plaintiff has submitted concerning the use and effects of chemical munitions, Urbshot notes that one of Plaintiff's exhibits, published by the Firearms Training Unit of the FBI, states that "OC particles will dissipate from an individual's clothing in a relatively short period of time", a statement that is consistent with his [Urbshot's] training and experience, and would have been the case here. Another part of Plaintiff's literature includes the statement that OC "is an organic, non-enduring substance, therefore decontamination is relatively quick and simple . . . . Expose to fresh air as soon as possible and flush contaminated areas with large amounts of cold water". Urbshot notes that this same literature states that an area can be decontaminated by ventilating the affected area, and that "[a]ll traces of OC can successfully disappear in as little as 30 minutes". Urbshot attests that these statements are again consistent with his training and experience, and apply to the situation in this case. Plaintiff was able to flush with cold water and his cell area would have decontaminated by the time he returned from the restraint chair. Urbshot attests that he is further advised that a nurse evaluated Plaintiff upon his return to his room from the restraint chair, and that the nurse did not find Plaintiff to be in any distress. Again, Urbshot attests that this is consistent with the fact that the OC spray used in this incident has an initial burning sensation and respiratory effect, but that with time even without washing, these effects go away.

Urbshot attests that pursuant to SCDC policies, the use of force, including chemical munitions, can be used to prevent and/or control disruptive behavior, to ensure institutional security and good order, or because an inmate refuses to obey a lawful order. Further, SCDC policy does not



require the use of video cameras for an unplanned use of force, such as that administered by Brown at 8:45 a.m.  Finally, Urbshot attests that although Plaintiff includes with his response some information concerning CS chemical agents, that CS agents were not used in this case and that information is therefore not relevant and does not apply to this matter.  See generally, Urbshot Affidavit.

**Discussion**

Summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Rule 56(c), Fed.R.Civ.P.  The moving party has the burden of proving that judgment on the pleadings is appropriate.  Once the moving party makes this showing, however, the opposing party must respond to the motion with "specific facts showing there is a genuine issue for trial."  Rule 56(e), Fed.R.Civ.P.  Further, while the Federal Court is charged with liberally construing a complaint filed by a pro se litigant to allow the development of a potentially meritorious case, see Cruz v. Beto, 405 U.S. 319 (1972); Haines v. Kerner, 404 U.S. 519 (1972), the requirement of liberal construction does not mean that the Court can ignore a clear failure in the pleadings to allege facts which set forth a Federal claim, nor can the Court assume the existence of a genuine issue of material fact where none exists. Weller v. Dep't of Social Services, 901 F.2d 387 (4th Cir. 1990).

**I.**

**(Exhaustion of Administrative Remedies)**

The Defendant initially argues that this case should be dismissed for failure of the Plaintiff to exhaust his administrative remedies with respect to any claims he has against her prior



to filing this lawsuit. Defendant argues that the only grievance Plaintiff exhausted was his grievance filed October 23, 2013 (LCI-1529-13), which only concerned the actions of Corporal Williams, and involving Plaintiff being taken out of his cell when there was an obstruction on the camera in the cell, and subsequently when he was placed by Williams into the restraint chair. Defendant argues that Plaintiff's second grievance, filed November 6, 2013 (LCI-1574-13), in which Plaintiff complains about Brown's conduct, and specifically to include her spraying him with chemical munitions and being placed in the restraint chair without being allowed to cleanse or decontaminate himself, was returned unprocessed, and that since Plaintiff never appealed the return of this Step 1 grievance, he failed to exhaust his administrative remedies with respect to any claims he may have against Brown. See generally, Jordan v. Miami-Dade County, 439 F.Supp.2d 1237, 1241-1242 (S.D.Fla. 2006)[Remedies not exhausted where inmate did not appeal denial].

The Defendant is correct that pursuant to 42 U.S.C. § 1997e(a), "[n]o action shall be brought with respect to prison conditions under section 1983 of this Title, or any other federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." Through the enactment of this statute, "Congress has mandated exhaustion clearly enough, regardless of the relief offered through administrative procedures." Booth v. Churner, 532 U.S. 731, 741 (2001); see Porter v. Nussle, 534 U.S. 516 (2002); Larkin v. Galloway, 266 F.3d 718 (7th Cir. 2001) [exhaustion required even though plaintiff claimed he was afraid]; see also Claybrooks v. Newsome, No. 00-7079, 2001 WL 1089548 (4th Cir. Sept. 18, 2001) (unpublished opinion) [applying Booth v. Churner to affirm district court's denial of relief to plaintiff]. Accordingly, before Plaintiff may proceed on his claims in this Court, he must first have exhausted the administrative remedies that were available to him at the prison.



The Defendant has the burden of showing that Plaintiff failed to exhaust his administrative remedies; see Anderson v. XYZ Correctional Health Services, Inc., 407 F.3d 674, 683 (4th Cir. 2005) [inmate's failure to exhaust administrative remedies is an affirmative defense to be both pled and proven by the Defendant]; Jones v. Bock, 549 U.S. 199 (2007); and to meet this burden, the Defendant has submitted the sworn affidavit of Michelle White setting forth the SCDC grievance procedure and Plaintiff's grievance history with respect to his claims, including the fact (which is undisputed) that Plaintiff did not appeal the denial of his second grievance when it was returned to him unprocessed.  Cf. Sullivan v. Coleman, No. 06-1588, 2006 WL 3759757, at * 6 (D.S.C. Dec. 18, 2006) [Finding that inmate abandoned grievance where he failed to properly complete and return Step 2 Inmate Grievance form]; see also Williams v. Reynolds, No. 12-138, 2013 WL 4522574, at * 4 (D.S.C. Aug. 27, 2013) [Noting that "even if plaintiff did file a Step 1 grievance that was returned unprocessed, there is no evidence that Plaintiff filed a Step 2 grievance or otherwise appealed the decision not to process the Step 1 grievance"].  Defendant argues that since the only grievance Plaintiff exhausted complained about the actions of Corporal Williams, not the Defendant, and did not even address all of the Plaintiff's interactions with prison officials on July 29, 2013, that she is entitled to dismissal of this case.  However, the undersigned does not agree with Defendant's argument.

The evidence shows that Plaintiff filed a Step 1 grievance relating to some of the issues involved in this case, specifically mentioning actions taken by Williams, and then filed a second Step 1 grievance which encompassed both these same issues as well as the additional incidents occurring on that date and specifically referencing the Defendant Brown.  Plaintiff's second grievance was returned to him unprocessed because prison officials determined that it was "duplicate



to issues raised" in his first grievance and inmates are only allowed "to submit one grievance per

incident or circumstance". Therefore, Plaintiff was clearly advised by prison officials that his first

grievance (which was being considered and investigated by prison officials) already encompassed

the issues Plaintiff was raising in his second grievance, and that therefore his second grienance was

being returned unprocessed because the SCDC grievance policy said he could not file two grievances

on these same issues. As such, to now argue that Plaintiff cannot pursue in this lawsuit claims that

he asserted in that second grievance against the Defendant Brown would be manifestly unjust, and

contrary to applicable case law. See Moore v. Bennette, 517 F.3d 717, 726, 729 (4th Cir. 2008)

[Noting that the PLRA exhaustion requirements do not prohibit claims against a defendant who has

not been named in prior grievances, but only requires "[c]ompliance with prison grievance

procedures",[3] and that a grievance should be deemed exhausted as long as prison officials have

---

[3]The SCDC prison grievance procedures do not have a specific naming requirement, but only require that the grievance "contain a brief statement of the circumstances of the grievance, to include date and time, why the grievant believes s/he is entitled to relief, and a brief statement of the action(s) requested for which relief may be available through the grievance procedure". See SCDC Inmate Grievance System Procedures, GA-01.12 (May 12, 2014), No. 13.2; Found at www.doc.sc.gov/pubweb/policy/GA-01-12.htm1471298422889.pdf. The court may take judicial notice of factual information located in postings on government websites. See Hall v. Virginia, 385 F.3d 421, 423 at n. 3 (4th Cir. Sept. 22, 2004) [Taking judicial notice of information publicly available on official government website; Tisdale v. South Carolina Highway Patrol, No. 09-1009, 2009 WL 1491409 at * 1 n. 1 (D.S.C. May 27, 2009), aff'd, 347 Fed. Appx. 965 (4th Cir. Aug. 27, 2009); In re Katrina Canal Breaches Consolidated Litigation, No. 05-4182, 2008 WL 4185869 at * 2 (E.D. La. September 8, 2008) [noting that courts may take judicial notice of governmental websites including other courts' records]; Williams v. Long, No. 07-3459-PWG, 2008 WL 4848362 at *7 (D. Md. November 7, 2008) [noting that some courts have found postings on government websites as inherently authentic or self-authenticating]; see also Starkey v Stirling, No. 133451, 2014 WL 6460285 at * 4 (D.S.C. Nov. 17, 2014) ["[T]he Fourth Circuit Court of Appeals held in Moore v. Bennette, [517 F.3d 717, 726 (4th Cir. 2008)] that the plaintiff did not have to identify specific individuals in his grievances where such identification was not required by the prison's grievance procedures."].



appropriate notice of any additional conditions or actions that the prisoner is contesting]; <u>cf</u>. <u>Williams v. Ozmint</u>, No. 08-4139, 2010 WL 3814287, at * 4 (D.S.C. Sept 23, 2010) [Finding that prisoner *did not* exhaust administrative remedies where the plaintiff's confinement conditions claims had not been alleged in any of his grievance forms].

Therefore, the undersigned does not find that the Defendant has met her burden of showing that Plaintiff failed to exhaust his administrative remedies.  <u>Anderson</u>, 407 F.3d at 683 [Inmate's failure to exhaust administrative remedies is an affirmative defense to be both pled and proven by the defendant]; <u>cf</u>. <u>Malik v. Sligh</u>, No. 11-1064, 2012 WL 3834850, at * 4 (D.S.C. Sept. 4, 2012) [Properly exhausting administrative remedies means using all steps that *the agency holds out*, and doing so properly so that the agency may address the issue on the merits]; <u>see</u> <u>also</u> <u>Stenhouse v. Hughes</u>, No. 9:04-23150, 2006 WL 752876, at * 2 (D.S.C. March 21, 2006)["[E]xhaustion may be achieved in situations where prison officials fail to timely advance the inmate's grievance or otherwise prevent him from seeking his administrative remedies"].

## II.

### (Plaintiff's Claims)

Plaintiff's allegations in his Complaint encompass some of the events of July 29, 2013, but not all.  First, Plaintiff alleges an excessive force claim with respect to the Defendant spraying chemical munitions into his cell during their first conversation about his having a jumpsuit. Next, Plaintiff then asserts a claim about being tackled, restrained, and placed on the floor naked by the FCMT, following which he was strapped into the restraint chair. This claim appears to conflate two separate events: the event at approximately 11:00 a.m. when the FCMT came to Plaintiff's cell because he had placed something over the camera in this cell, and the event at approximately 11:47



a.m. when the FCMT takes him and places him in the restraint chair. Giving Plaintiff's Complaint the liberal construction to which he is entitled as a <u>pro se</u> litigant, the undersigned has therefore considered both of these events in assessing Plaintiff's constitutional claims. Finally, Plaintiff complains about not being allowed to cleanse or decontaminate himself, as well as that his cell was not decontaminated before he was placed back in the cell.

The undersigned first discusses hereinbelow Plaintiff's claims that are covered by the video evidence submitted to the Court. Plaintiff's claim about being "gassed" by the Defendant Brown prior to the first video is recorded is then discussed separately.

### Plaintiff's claims covered by the video evidence

When reviewing an excessive force claim, the Court should consider 1) the need for the application of force, 2) the relationship between the need and the amount of force that was used, 3) the threat to the staff and inmates as reasonably perceived by the prison officials on the basis of the facts known to them, 4) the efforts made to temper the severity of a forceful response, and 5) the extent of the injuries suffered by the prisoner. <u>Whitley v. Albers</u>, 475 U.S. 312, 321 (1986); <u>Hill v. Crum</u>, 727 F.3d 312, 327 (4th Cir. 2013); <u>see</u> <u>Majette v. GEO Group, Inc.</u>, No. 07-591, 2010 WL 3743364, at * 6 (E.D.Va. Sept 22, 2010); <u>see also</u> <u>Hudson v. McMillian</u>, 503 U.S. 1, 7 (1992) [the core judicial inquiry is whether force was applied in a good faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm]; <u>Mann v. Failey</u>, 578 Fed.Appx. 267, 273 (4th Cir. July 17, 2014) [In order to prevail on an Eighth Amendment excessive force claim, Plaintiff must show both that the deprivation suffered or injury inflicted was sufficiently serious, and that the prison official acted with a sufficiently culpable state of mind], citing <u>Williams v. Benjamin</u>, 77 F.3 756, 761 (4th Cir. 1996).



Further, Plaintiff's evidence must also establish that the Defendant named in this case participated in, or can be held liable for, any excessive force that was used against him.  See Barren v. Harrington, 152 F.3 1193, 1194 (9th Cir. 1999) ["Liability . . . must be based on the personal involvement of the Defendant"], cert denied, 522 U.S. 1154 (1999); Wilson v. Cooper, 922 F.Supp. 1286, 1293 (N.D.Ill. 1996); see also Horton v. Marovich, 925 F.Supp. 540 (N.D.Ill. 1996) ["Thus, a plaintiff suing a government official in his individual capacity and therefore seeking to hold the official personally liable must show that the official personally caused or played a role in causing the deprivation of a federal right"]; Vinnedge v. Gibbs, 550 F.2d 926, 927-929 and n. 1-2 (4th Cir. 1977) [It is well settled that the doctrine of vicarious liability and the doctrine of respondeat superior are not applicable in § 1983 actions].

**Cell Extraction Excessive Force Claim**.  With respect to Plaintiff's cell extraction at around 11:00 a.m., the Defendant has submitted substantial testimonial and documentary evidence, including video evidence, showing that at the time force was used, it was necessary for Plaintiff to be removed from his cell in order to take some type of obstruction off of the camera in his cell and otherwise clean out his cell.  Plaintiff has provided no evidence to dispute the reason the Force Team, to include the Defendant, had to come to his cell door at that time.[4]  Further, while Plaintiff has submitted some affidavits from other inmates attesting to what happened once the force team entered his cell, he has again submitted no evidence to dispute, and indeed the video tape evidence confirms, that Plaintiff was first asked several times by Brown to come to the door and be cuffed so that he could be taken out of the cell (which, if Plaintiff had complied, would not have

---

[4]Indeed, in his Complaint, Plaintiff incorrectly alleges that the reason they were there was to take him to the restraint chair, which actually occurred about an hour later.



required the use of any force against the Plaintiff), but that Plaintiff refused to do so. The video then shows a correctional officer (but not the Defendant Brown) shooting a short burst of munitions into the cell through the food flap, following which Plaintiff is again asked to come forward and be handcuffed. Plaintiff again refuses, while yelling and cursing at the officer. The cell doors then open and the team rushes in to subdue the Plaintiff.

Based on these facts and the evidence, the Defendant (who by all appearances was in charge of the extraction team, although she was not one of the officers who actually went into the cell to subdue the Plaintiff) certainly would have reasonably perceived a threat, as well as a need for the application of force to get the situation under control. It is simply a truism that when prison inmates are non-compliant with legitimate instructions and prison requirements, physical force sometimes has to be applied in order to gain compliance and maintain institutional security, the security of prison employees, as well as the inmates themselves. It is only when the force used under such circumstances is constitutionally excessive that a viable § 1983 claim is presented. Based on the facts and evidence, there is no genuine issue of fact as to whether the extraction team (headed by the Defendant)[5] was justified in going into Plaintiff's cell and using physical force to subdue him based on Plaintiff's own conduct, his security status and history as a dangerous inmate, and his failure to comply with the Defendant's instructions to come forward and be restrained.

With respect to the amount or type of force that was used, it must first be noted that

-------------------

[5]Although the Defendant was not one of the officers who entered the cell to remove the Plaintiff, as the individual in charge she could be liable under these facts if a constitutional violation occurred. Horton, 925 F. Supp. 540; see Randall v. Prince George's Co., Md., 302 F.3d 188, 203 (4th Cir. 2002) [Discussing concept of bystander liability]; see also O'Neill v. Krzeminski, 839 F.2d 9, 11-12 (2nd Cir. 1988)[observing that officer who stands by and does not seek to assist a victim could be liable as a "tacit collaborator"].



the use of pepper spray by prison officials is not a violation of a prisoner's constitutional rights when used appropriately. Williams, 77 F.3d 763; Peterson v. Davis, 551 F.Supp. 137 (D.Md. 1982), aff'd without op., 729 F.2d 1453 (4th Cir. 1984); Williams v. Dehay, Nos. 94-7114, 94-7115, 1996 WL 128422 **2-3 (4th Cir. March 21, 1996). Indeed, chemical sprays are generally used in order to *avoid* having to use direct physical force, or in an attempt to lessen the amount of physical force necessary. Cf. Whitmore v. Walker, No. 04-837, 2009 WL 900034 at * 9 (S.D.Ill. Mar. 27, 2009) ["[E]ighth Amendment does not require prison guards to engage in physical struggle with an inmate before using chemical mace. Indeed, part of the rationale for using mace is to allow the guards to avoid engaging in physical altercations with an inmate."]. Prisons are dangerous places, and prison officials are entitled to take necessary precautions to protect themselves from risk of harm and injury at the hands of inmates, in particular high security inmates.[6]

Here, the evidence shows that a chemical agent was used (although not by the Defendant, but reasonably construed to be at her direction) in an attempt to obtain compliance from the Plaintiff only after multiple attempts to obtain compliance through verbal requests and commands were unsuccessful. See Grissom v. Roberts, No. 09-3128, 2009 WL 2601260 at * 6 (D.Kan. Aug. 24, 2009)[Finding that under the circumstances, which included Plaintiff refusing to

---

[6]Defendant's evidence, which Plaintiff has not contested, is that Plaintiff (a large individual, as is shown in the video) has a history of multiple offenses ranging from threatening to inflict harm on employees, assault and/or battery of an SCDC employee, throwing substances, striking an inmate, striking an SCDC employee, and even possession of weapons. He was even convicted of striking an employee as part of this cell extraction. No correctional officer would have reasonably wanted to risk having to be involved in a direct physical confrontation with an unrestrained high security inmate (which typically has to be done through extraction teams wearing protective body armor). To the contrary, the use of every other option possible to gain Plaintiff's compliance without having to use direct physical force, during which both the officers and the inmate run the risk of serious injury, was a reasonable course of action.



obey orders, Plaintiff failed to show that the use of physical force including pepper spray was repugnant to the conscience of mankind]. A small amount of pepper spray was then administered as an alternative to direct physical force having to be used. The Fourth Circuit has held that chemical sprays can be used constitutionally in small quantities to control a "recalcitrant inmate"; Landman v. Peyton, 370 F.2d 135, 138, n. 2 (4th Cir. 1966);[7] and the facts before this Court show that the relationship between the need and the amount of spray that was used here was within acceptable constitutional limits. Notwithstanding some of Plaintiff's inmate affidavits conclusorily asserting that "excessive" amounts of gas was sprayed into his cell, the affidavit and documentary evidence provided to the Court shows that the actual amount of pepper spray that was used in an attempt to gain Plaintiff's compliance prior to the cell extraction team being required to enter his cell was only 28 grams. See Brown Affidavit, and attached Exhibit C. The evidence further shows that the pepper spray was used in order to diffuse a situation of Plaintiff's own making, to gain his compliance, and to minimize the risk of injury to both Plaintiff and the prison guards which can result where a direct physical confrontation is required. Therefore, the undersigned does not find that a genuine issue of fact exists as to whether the amount of pepper spray shown in the evidence and used for this purpose constituted a violation of Plaintiff's constitutional rights. Cf. Townsend v. Anthony, No. 03-2528, 2006 WL 2076920, at * 9 (D.S.C. July 24, 2006) [Finding a twenty gram discharge was acceptable]; Plummer v. Goodwin, No. 07-2741, 2010 WL 419927 at * 7, n. 4 (D.S.C. Jan. 29, 2010) [Finding that a discharge of 33.5 grams was a relatively small amount]; see also, Bailey v. Turner, 736 F.2d

---

[7] See Bailey v. Turner, 736 F.2d 963, 968-969 (4th Cir. 1984)[same]; see also Collins v. McGhee, No. 15-2437, 2016 WL 4579125 at * 3 (D.S.C. July 27, 2016), adopted by, 2016 WL 4541606 (D.S.C. Aug. 29, 2016).



963, 969 (4th Cir. 1984) [In determining whether the amount of force used was reasonable, courts should evaluate the "totality of the circumstances, including the provocation, the amount of gas used, and the purposes for which the gas is used (to) determine the validity of the use . . . ."]; Landman, 370 F.2d at 138, n. 2 [Mace can constitutionally be used in small quantities to control a "recalcitrant inmate"]; Whitley, 475 U.S. at 321 [Conduct only actionable where evidence shows it was taken "in bad faith and for no legitimate purpose"].

Additionally, there is no evidence to show that, once the cell extraction team was required to go in to the cell to subdue the Plaintiff, any excessive force was used in this case. The video shows the officers holding Plaintiff down and restraining him while they are attempting to get Plaintiff handcuffed (and during which Plaintiff struck one of the officers with a handcuffed wrist, an offense for which he was later convicted as is shown by the evidence), but the video does not appear to show any officer hitting or striking the Plaintiff. The team members then picked the Plaintiff up and carried him out of the cell, all while Plaintiff is yelling and cursing at them, and he is laid on the floor outside of his cell. The video does not show any further force being used against the Plaintiff. Cf. Wilson v. Flynn, 429 F.3d 465, 469 (4th Cir. 2005)[Lack of evidence that officers used any improper force after restraining a prisoner "distinguishes [Plaintiff's] case from many in which we have held the Plaintiff has alleged an excessive force claim."]; cf. Mann, 578 Fed.Appx. 274-275 [Noting that where evidence showed officers continued to apply force against inmate "well after he had ceased his resistance", claim could proceed].

Further, while the video does show that a cord or "leash" was tied to Plaintiff's handcuffs as a means of control, the actual video evidence directly contradicts Plaintiff's allegation in his Complaint that he was maliciously dragged across the floor by correctional officers, or (as



stated by Briggs in his affidavit) that at the conclusion of this incident the officers "dragged" Plaintiff back into his cell across the concrete floor.[8]  No such events took place during this encounter. Morgan v. Church's Fried Chicken, 829 F.2d 10, 12 (6th Cir. 1987) ["Even though pro se litigants are held to less stringent pleading standards than attorneys the court is not required to 'accept as true legal conclusions or unwarranted factual inferences.'"]; see Lowe v. Matheney, No. 13-22416, 2015 WL 5795870 at * 3 (S.D.W.Va. Sept. 20, 2015) [Finding that "[t]he video submitted by the Defendants wholly contradicts the Plaintiff's allegations, warranting summary judgment."] (citing Scott v. Harris, 550 U.S. 372, 380 (2007).  Additionally, not only does Plaintiff not appear to be in any distress, he even starts singing while he is lying on the floor.  Then, after the cell is cleaned (an officer can be seen sweeping out the cell in the background), Plaintiff is carried back into the cell and the restraints are removed.  Again, no hitting or striking of the Plaintiff is observed on the video, and after the door to the cell is closed, Plaintiff is observed standing up at the door looking out. There is simply no genuine issue of fact that excessive force was used during this cell extraction based on this evidence.  Silvia Dev. Corp. v. Calvert County, Md., 48 F.3d 810, 818 (4th Cir. 1995)[Explaining that while the party opposing summary judgment is entitled to the benefit of inferences that can be drawn from the evidence, "[p]ermissible inferences must still be within the range of probability" and that "[w]hether an inference is reasonable cannot be decided in a vacuum; it must be considered in light of the competing inferences to the contrary"] (internal quotation marks

---

[8]The actual video of this incident also directly contradicts inmate Bacchus' affidavit, who attested that he saw officer Williams "dragging the Plaintiff by a leash on the floor naked, while he was in handcuffs and leg irons".  Cf. Garcia v. McClaskey, No. 12-93, 2016 WL 2903234, at * 6 [M.D.N.C. May 18, 2016) [Noting that courts credit a plaintiff's version of the facts only to the extent consistent with the record video evidence, and citing cases].



omitted); see also Williams, 77 F.3d 761 [because prison officials are entitled to use appropriate force to quell prison disturbances, and because these officials oftentimes must act under pressure without the luxury of a second chance, in order for a prisoner to prevail on an Eighth Amendment claim he must demonstrate that officials applied force maliciously and sadistically for the very purpose of causing harm].

Finally, Plaintiff has also failed to show that he suffered any significant injury as a result of this incident. While Plaintiff complains about the effect of the gas on him, and being subjected to pepper spray and being physically restrained while being placed in handcuffs is undoubtedly an unpleasant experience, the medical and video evidence provided to the Court reflects that Plaintiff was checked by medical personnel following this incident and was observed to be in no obvious distress. Further, Plaintiff can be seen at one point on the video decontaminating himself by wiping his eyes with a piece of paper towel or toilet paper, there is no evidence that Plaintiff did not also have access to water in his cell for this purpose, and as the nurse appears on camera to state that Plaintiff appears to be okay, he can again be seen in the background standing at the door of the cell. Hence, Plaintiff has failed to produce any evidence showing he suffered any significant injury as a result of this incident. See Strickler v. Waters, 989 F.2d 1375, 1380-1381 n. 9 (4th Cir. 1993) [the mere incantation of physical or mental injury is inadequate to survive a motion for summary judgment]; House v. New Castle County, 824 F.Supp. 477, 485 (D.Md. 1993) [Plaintiff's conclusory allegations insufficient to maintain claim].

Although it is not required that Plaintiff show he suffered more than a de minimis injury to maintain an excessive force claim; see Wilkins v. Gaddy, 130 S.Ct. 1175, 1179-1180 (2010)[Noting that the notion that significant injury is a threshold requirement for stating an



excessive force claim was rejected in <u>Hudson</u>, 503 U.S. at 7]; the extent of any injury suffered by an inmate is still one of the five factors to be considered under <u>Whitley</u> in evaluating an excessive force claim, and the "absence of [a] serious injury" remains relevant in an Eighth Amendment inquiry. <u>Wilkins</u>, 130 S.Ct. at 1179-1180 [holding that the extent of injury may provide some indication of the amount of force applied, and stating that "[a]n inmate who complains of a 'push or shove' that causes no discernible injury almost certainly fails to state a valid excessive force claim"], citing to <u>Hudson</u>, 503 U.S. at 9 (quoting <u>Johnson v. Glick</u>, 481 F.2d 1028, 1033 (2d Cir. 1973)); <u>see also</u> <u>Ellerbe v. Roach</u>, No. 08-3118, 2010 WL 3361703, at * 3 (E.D.N.C. Aug 24, 2010); <u>Mann</u>, 578 Fed.Appx. 272 [Noting that "a lack of injury is not dispositive, *so long as* there is sufficient evidence of maliciously - applied force"] (emphasis added).

        In sum, the evidence relating to Plaintiff's cell extraction is not sufficient to create a genuine issue of fact as to whether Plaintiff's constitutional rights were violated, and this claim should therefore be dismissed. <u>Cf</u>. <u>Wilson v. Broddy</u>, No. 14-2531, 2015 WL 11143429, at * 5-6 (D.S.C. Mar. 30, 2015), <u>aff'd</u>, 621 Fed.Appx. 246 (4th Cir. Nov. 5, 2015).

        **Restraint Chair Claim**.  With respect to Plaintiff's placement in the restraint chair, placement in a restraint chair does not in and of itself constitute an excessive use of force, as the use of devices such as restraint chairs or 4-point bed restraints have repeatedly been found to be constitutional when used appropriately. <u>Rodriguez v. Taylor</u>, No. 08-1027, 2008 WL 5244480, at * 8 (D.S.C. Dec. 15, 2008); <u>Coleman v. McMillian</u>, No. 12-916, 2014 WL 1249290, at * 5 (D.S.C. Mar. 26, 2014).

        Here, the evidence before the Court confirms that Plaintiff was placed in a restraint chair shortly following an incident where he had been refusing to obey orders, resulting in a cell



extraction team having to be deployed and during which he struck an officer.[9]  Placement of recalcitrant inmates in restraint chairs as a means to maintain "order and control" is not a violation of the Constitution.  Cf. Williams, 77 F.3d at 763-764 [Finding that officers' decision to confine Plaintiff in restraints after a disturbance was a not unreasonable attempt to restore "order and control" to the situation]; Coleman, 2014 WL 1249290, at * 5 [Placement in restraint chair in order to prevent plaintiff from "disrupting the orderly operations of the facility as well as potentially causing injury to himself, the staff, or the facility" found to be proper].

        Additionally the video evidence show that after Plaintiff is secured (Plaintiff again refuses to turn around and be cuffed despite repeated requests, requiring the extraction team to again have to enter his cell and risk injury in order to subdue him), he is walked (not dragged, as Plaintiff has alleged) down the hall to the restraint chair.  There does not appear to be anything wrong with the Plaintiff; there is no hitting, striking or undue violence reflected on the video, and Plaintiff is talking, cursing, and at one point even singing, as he is walked down the hall.  There is also no undue violence or force used during Plaintiff's placement in the restraint chair, nor does Plaintiff appear to be resisting, although he keeps yelling and cursing and at one point does appear to attempt to head butt an officer who is close to him.  Plaintiff is seated with a towel draped over him, and while he continues to complain, there is a nurse present who monitors the entire process and states that Plaintiff does not appear to be in any distress.  As previously noted, Plaintiff can even at one point be heard to say "this isn't as bad as I thought it was", and then laughs.  Again, no genuine issue of fact that a constitutional violation has been committed is presented in this evidence.  Mackey v.

---

[9]It is also noted that Plaintiff was ordered to be placed in the restraint chair by Warden McFadden, not by the Defendant named in this case.  See McFadden Affidavit.



Anderson County Detention Center, No. 06-1180, 2007 WL 1656231, at * 1 (D.S.C. June 5, 2007) [Finding detainee's placement in a restraint chair was not a per se constitutional violation].

Plaintiff may also be attempting to present a claim with respect to how *long* he was kept in the restraint chair, as he argues that he was kept in the restraint chair for six hours when he should have only been kept in the chair for four hours. Continuing to hold an inmate in a restraint chair for an extended period of time following an incident can give rise to a genuine issue of fact as to whether a constitutional violation occurred. Williams, 77 F.3d at 764. However, the facts and evidence presented in this case do not support such a finding here. Again, the video evidence shows that Plaintiff was not in any distress at the time he was placed in the restraint chair. No pepper spray had been used during his cell extraction, there is no evidence that he had been injured in any way or was suffering from any injuries, the video shows that the nurse checked the tightness of his leg shackles when Plaintiff complained about them, there was in fact a nurse present at all times monitoring his placement in the restraint chair and his condition, and Brown attests that Plaintiff was removed from the restraint chair as soon as there were sufficient guards present to handle this procedure. This testimony is supported by Defendant's attached Exhibit F, which documented the removal process, and states under the supervisor's comments: "FCNT summoned. I/M Singleton seen by medical and was removed from the chair after 4 hrs. due to staffing . . . ." Plaintiff has presented no evidence whatsoever to show that he was kept in the restraint chair for longer than four hours because of any undue punishment being inflicted or because of some malicious attempt to inflict harm on him. Cf. Battle v. King, No. 12-2476, 2013 WL 5203650, at * 9 (D.S.C. Sept. 16, 2013) [Noting that inference that prison guards were acting to punish, rather than quell a disturbance, can be found where guards maintain prisoner in restraints for a long period of time



while refusing to allow him to wash and denying him medical attention]; see also Mann, 578 F.Appx. 273-274 [Allowing Plaintiff's claim to proceed where there was "ample evidence from which a fact finder could find that [defendants] acted maliciously, sadistically, and in violation of the Eighth Amendment"].

   Plaintiff's claim in his Complaint that during the time he was in the restraint chair he was "covered with and burning from being tortured by the chemical munitions" and "screaming in agony begging for a shower and medical attention" is also belied by the video evidence, which not only shows that Plaintiff was in no distress while being placed in the restraint chair and was even observed laughing and stating "this isn't as bad as I though it was", but when the force team is taking Plaintiff out of his restraints Plaintiff starts singing again, and then gets up and walks back to his cell without incident, singing all the way and holding his blanket.  Then, after being placed in his cell, Plaintiff can be seen jumping up and down at the cell door, yelling at and taunting the officers. Again, there is also a nurse present during this entire procedure, who states on the video that Plaintiff is okay.  See generally, Defendant's Exhibit G.

   The undersigned has no doubt that being placed in a restraint chair is uncomfortable and unpleasant.  However, just because Plaintiff was subjected to this form of restraint does not mean his constitutional rights were violated.  Mackey, 2007 WL 1656231, at * 1 [Finding detainee's placement in a restraint chair was not a per se constitutional violation].  At what time, or after how long a period of time, an inmate should be released from a restraint chair is properly determined based on the inmate's demeanor in conjunction with considerations of officer safety, and as was noted by the Fourth Circuit in Williams, prison administrators are afforded discretion in determining what is necessary (such, as in this case, sufficient staffing being necessary before attempting to move



the inmate) for the prison's internal security.  <u>Williams</u>, 77 F.3d at 765.  While a decision on how long restraints may be continued calls for the exercise of good judgment on the part of prison officials, their decisions are entitled to deference as long as the evidence does not show their actions were taken in bad faith or for no legitimate purpose.  <u>Id.</u>; <u>Mann</u>, 578 F.Appx. at 274-275.  Here, there is no evidence that shows that the prison officials' use of a restraint chair under the facts of this case was malicious and sadistic such that it amounted to constitutionally excessive force.[10]  Rather, Plaintiff was himself the cause of his discomfort, and the court should not second guess prison administrators who have to make real time judgments when dealing with volatile inmates in dangerous settings unless there is compelling evidence (considered in the light most favorable to the Plaintiff) that a constitutional violation has occurred.  <u>Boone v. Stallings</u>, 583 Fed.Appx. 174, 175 (4th Cir. Sept. 11, 2014) ["Prisoner must meet a heavy burden to satisfy the subjective component - that prison officials applied force maliciously and sadistically for the very purpose of causing harm rather than in a good faith effort to maintain or restore discipline"] (internal quotes omitted); <u>Johnson</u>, 481 F.2d at 1033 ["not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates a prisoner's constitutional rights"]; <u>Coleman</u>, 2014 WL 1249290, at * 5-6 [Where Plaintiff was regularly checked throughout the period of restraint and there was no evidence that Plaintiff was subjected to any serious physical distress during that time period, use of restraint chair was not malicious and sadistic in violation of <u>Whitley</u>].

_____

[10]Indeed, restraints of up to 20 hours, over twice the time period at issue in this case, have been found to be constitutional.  <u>Blakeney v. Rusk County Sheriff</u>, 89 Fed.Appx. 897, 899 (5th Cir. 2004) [Pre-trial detainee's rights were not violated when he was placed in restraint chair for twenty hours after he disobeyed orders and engaged in unruly, destructive practices, since the purpose was not punishment] [bench trial].



Therefore, this claim is without merit and should be dismissed.  See Whitley, 475 U.S. at 320-321 [Plaintiff carries a "heavy" burden to satisfy the subjective component of an excessive force claim; i.e., he must prove that correctional officers applied force "maliciously and sadistically for the very purpose of causing harm", rather than in a good faith effort to maintain or restore disciple]; Blakeney, 89 Fed.Appx. at 899 [Pre-trial detainee's rights were not violated when he was placed in restraint chair for twenty hours after he disobeyed orders and engaged in unruly, destructive practices, since the purpose was not punishment] [bench trial]; Rodriguez, 2008 WL 5244480, at * 9.

**Decontamination Claim**.  Finally, with respect to Plaintiff's claim that he was not allowed to properly decontaminate following being subjected to pepper spray, denial of decontamination can give rise to an Eighth Amendment claim.  Williams, 77 F.3d at 768; Mann, 578 F.Appx. 273.  However, to survive summary judgment, Plaintiff must do more than simply allege he was not allowed to sufficiently decontaminate.  Rather, Plaintiff must have *evidence* to support his claim that he was not allowed to decontaminate, and that the Defendant's treatment of him under the circumstances was a violation of his constitutional rights.  Morgan, 829 F.2d at 12 ["Even though pro se litigants are held to less stringent pleading standards than attorneys the court is not required to 'accept as true legal conclusions or unwarranted factual inferences.'"]; cf. Mann, 578 Fed.Appx. 274-275 [In order to avoid summary judgment Plaintiff must have evidence to show the Defendant officers "wantonly denied [Plaintiff's] repeated requests to wash off the painful effects of pepper spray . . . ."].  Plaintiff has failed to meet this standard with respect to this claim.

Plaintiff attests in his verified Complaint, and his inmate affidavits confirm, that he was not taken for a shower after having been subjected to pepper spray on the day in question.



Indeed, the Defendant does not contest that Plaintiff was not allowed to take a shower. That does not, however, in and of itself establish a constitutional violation. Plaintiff had access to water in his cell with which to wash any pepper spray residuals out of his eyes or off of his skin as necessary. Cf. Mitchell v. SCDC, No. 09-1010, 2010 WL 5174009, at * 3 (D.S.C. Nov. 16, 2010) [No constitutional violation where plaintiff had running water to wash off chemical spray], adopted by, 2010 WL 5173863 (D.S.C. Dec. 15, 2010). Further, Plaintiff's claims (as well as the claims in some of his inmate affidavits) that during these events he was "screaming in agony" that the "gas was burning" him and that he was begging for a shower is directly contradicted by the video evidence, during which Plaintiff can be seen at various times jumping up and down, cursing, singing, laughing, and bantering back and forth with correctional officers. Cf. Garcia, 2016 WL 2903234, at * 6 [Plaintiff's version of the facts only credited to extent not contradicted by the record video evidence]. The video evidence also includes statements by a nurse, who indicated that Plaintiff was okay and in no distress, as well as documentary evidence reflecting that Plaintiff was checked by nurses on separate occasions with no medical problems being noted. See Brown Affidavit, attached Exhibits E and F; Mauney Affidavit, with attached Exhibit [SCDC Health Services Medical Summary]. The Defendants have also submitted evidence reflecting the minimal amount of pepper spray used (36 grams during the 9:00 a.m. incident, and 28 grams during the 11:00 a.m. incident), as well as the minimal effects this amount of pepper spray would have caused. See Brown Affidavit, attached Exhibits A, C; Urbshot Affidavit.

These facts are not similar to the situation present in Mann, in which a claim relating to deprivation of contamination was allowed to proceed where the Plaintiff had supported his claims with more than fifty exhibits documenting that he was wantonly not allowed to wash off chemical



residue as punishment by prison officials, with the Defendants in that case not even offering any evidence to refute Plaintiff's contention that he was not permitted to wash off chemical munitions prior to being placed into a restraint chair. See Mann v. Failey, Civil Action No. 0:11-2232 (D.S.C.), Docket No. 180, pp. 20-21.[11] The Fourth Circuit in Mann held that there was ample evidence from which a fact finder could find that the Defendants acted maliciously and sadistically with respect to Mann's failure to decontaminate claim because the officers not only did not permit Plaintiff to decontaminate, but no medical personnel checked on his condition, and the Defendants offered "no evidence that [Mann] was not in the [pain] he allege[d]". Mann, 578 Fed.Appx. 274.

Here, however, Plaintiff has offered nothing more than the bare statements in his Complaint and "sworn statements" from himself and other prisoners that he was not allowed to shower (which Defendant is not disputing), and that he was placed in a restraint chair even though he was still complaining about the effects of the chemical agents. However, the documentary and video evidence flatly contradicts Plaintiff's claim both that he was not allowed to decontaminate and that he was suffering significant distress as a result of the residual effects of the pepper spray, while Plaintiff has offered no medical evidence to support his contention that he was in any kind of severe or significant physical distress. see House, 824 F.Supp. at 485 [Plaintiff's conclusory allegations insufficient to maintain claim]. Plaintiff cannot simply allege that he was still suffering from significant after effects from the chemical spray and was not allowed to wash off, provide no probative evidence to support this claim or to show that the Defendant wantonly ignored his condition other than his own self-serving statements, and expect to survive summary judgment,

---

[11] Aloe Creme Laboratories, Inc., 425 F.2d at 1296 [a federal court may take judicial notice of the contents of its own records].



particularly where there is substantial evidence in the case record to the contrary.  Cf. <u>Sylvia Dev.</u> <u>Corp. v. Calvert County, MD.</u>, 48 F.3d 810,818 (4th Cir. 1995)[explaining that while the party opposing summary judgment is entitled to the benefit of inferences that can be drawn from the evidence, "[p]ermissible inferences must still be within the range or reasonable probability" and that ["[w]hether an inference is reasonable cannot be decided in a vacuum; it must be considered in light of the competing inferences to the contrary" (internal quotation marks omitted)]; <u>see</u>, <u>e.g.</u>, <u>Riley v.</u> <u>Honeywell Technology Solutions, Inc.</u>, 323 Fed.Appx. 276, 278, n. 2 (4th Cir. 2009)[Holding that Plaintiff's "self-serving contentions" that he was subjected to unconstitutional treatment "were properly discounted by the district court as having no viable evidentiary support"].

   Therefore Plaintiff's claim of a constitutional violation because he was not allowed to decontaminate is without merit and should be dismissed.  <u>Cf</u>. <u>Mitchell</u>, 2010 WL 5174009, at * 3 [No constitutional violation where plaintiff had running water to wash off chemical spray], <u>adopted</u> <u>by</u>, 2010 WL 5173863 (D.S.C. Dec. 15, 2010); <u>cf</u>. <u>Mann</u>, 578 Fed.Appx. 274-275 [In order to avoid summary judgment Plaintiff must have evidence to show the Defendant officers "wantonly denied [Plaintiff's] repeated requests to wash off the painful effects of pepper spray . . . ."]; <u>Stanley v.</u> <u>Hejirika</u>, 134 F.3d 625, 634 (4th Cir. 1998) ["[A] court may allow an inmate's claim to go to the jury only if it concludes that the evidence, viewed in the light most favorable to the claimant, will support a reliable inference of wantonness in the infliction of pain"] (internal quotation marks omitted); <u>Wilson</u>, 2015 WL 11143429, at * 7.

**Plaintiff's claim not covered by the video evidence**

   Plaintiff's remaining claim, and the only one not covered by the video evidence submitted to the Court, is that the Defendant subjected him to an excessive use of force when she



sprayed pepper spray into his cell during their first conversation about his having a jumpsuit. Specifically, Plaintiff alleges the Defendant approached his cell and asked him why he still had a jumpsuit, and that when he began explaining the situation the Defendant "without warning . . . opened my food servs. flap and administered an extremely long burst of chemical munitions . . . .". Plaintiff further alleges that in an attempt to avoid further "assault", he ran to the back of his cell, but that the Defendant continued to administer "several long bursts" of chemical munitions into his cell, before leaving.[12]  Plaintiff's inmate witness, Anthony Briggs, also states in his affidavit that he observed Brown approach Plaintiff's door and ask about a jumpsuit officers had given him, and that "seconds later she opened his food service flap and administered 'several long bursts'" of pepper spray.[13]  Inmate Davis Bacchus also attests in his affidavit that he observed the Defendant go to Plaintiff's cell and overheard her say something about a jumpsuit, before opening Plaintiff's food flap and gassing him "several times" before leaving the wing.

        Brown's version of this event is not that dramatically different.  Brown attests that at approximately 8:45 a.m. she went to the door of Plaintiff's room after being informed by another officer that Plaintiff was in possession of a jumpsuit.  Brown attests that since Plaintiff was on crisis intervention, he was not allowed to have a jumpsuit or any other personal belongings in his room.

---

        [12]Plaintiff also alleges that about ten to fifteen minutes later the Defendant returned and gassed him again.  However, as previously noted, Plaintiff has conflated the various events of that day in setting forth his allegations in his Complaint.  This second event is apparently the pepper spray incident that is actually part of Plaintiff's cell extraction claim, already discussed, supra.

        [13]Briggs also attests that the Defendant left and returned "multiple times, opening his flap and administering chemical munitions . . . into his cell", a claim which Plaintiff does not even to appear to assert.  Like the Plaintiff's "conflating" of the events of that day in his Complaint, Briggs may be referencing the later time where pepper spray was used, already discussed herein, supra.  In any event, the documentary evidence provided to the Court shows that only 36 grams of pepper spray (total) was used during this event.  See Defendant's Attached Exhibit A.



Brown attests, however, that Plaintiff refused to give the jumpsuit to her, so in an effort to get him to comply she administered "2 small bursts of chemical munitions" into his cell, totaling about 36 grams. Brown attests that even after this effort to gain Plaintiff's compliance, he continued to refuse to give her the jumpsuit, requiring her to assemble an FCMT team to retrieve the jumpsuit. Only then, when the FCMT approached Plaintiff's door at approximately 9:30 a.m., did Plaintiff give up the jumpsuit when directed to do so. <u>Brown Affidavit</u>, with attached Exhibits A and B (Incident Reports), and Video 1 of Exhibit G.

Considered in the light most favorable to the Plaintiff, based on Plaintiff's statements in his verified Complaint and the statements of his inmate witnesses, the evidence is that Plaintiff was in the possession of a jumpsuit in his control cell when he was not supposed to be. The Defendant Brown came to his cell to inquire why he was in possession of a jumpsuit. Plaintiff and both of his witnesses state that during the course of the conversation between Plaintiff and the Defendant, during which (Plaintiff alleges) he was explaining to Brown that he needed to keep the jumpsuit until another officer returned with a blanket for him, the Defendant discharged some pepper spray into his cell. While Plaintiff and his witnesses describe this as "several long bursts" of pepper spray, the documentary evidence provided to the Court shows that the amount of pepper spray administered totaled 36 grams. <u>See</u> Defendant's Attached Exhibit A. There is also no dispute in the evidence that, following this incident, Plaintiff remained in possession of the jumpsuit, and did not relinquish the jumpsuit to prison officials until after the Defendant returned approximately thirty minutes later with the FCMT. <u>See</u> Defendant's Attached Exhibits A and B (Incident Reports) and Video 1 of Exhibit G.

Therefore, even under Plaintiff's own facts, the Defendant had a reason to use pepper



spray - Plaintiff was in possession of a jumpsuit he was not supposed to have and there is no indication, even in Plaintiff's evidence, that he was prepared to surrender it to the Defendant. Plaintiff was also in a control cell at the time and since part of the protocol is for Plaintiff not to have a jumpsuit, if Plaintiff used the jumpsuit to harm himself, the Defendant could have possibly been liable in that situation.  While Plaintiff may argue that the Defendant should have simply left and returned with the cell extraction team instead of attempting to gain his compliance through the use of pepper spray in the first instance, that decision does not turn her action into a constitutional violation as, as has previously been noted,  the use of small amounts of chemical spray in an attempt to obtain compliance and maintain order, in lieu of resorting to actual physical force or violence, has been held not to amount to a violation of an inmate's constitutional rights.  Hudson, 503 U.S. at 7 [the core judicial inquiry is whether force was applied in a good faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm]; Landman, 370 F.2d at 138, n. 2 [Mace can constitutionally be used in small quantities to control a "recalcitrant inmate"]; see Collins, 2016 WL 4579125 at * 3 ["[T]he Fourth Circuit has stated that a limited application of mace may be much more humane and effective than a flesh to flesh confrontation with an inmate and because a limited use of mace constitutes a relatively mild response compared to other forms of force, the initial application of mace indicates a tempered response by the prison officials"] (internal quotation marks and citations omitted).

Further, the relatively small amount of pepper spray used here, in conjunction with the reasons for which it was used and in light of the totality of the circumstances, does not create a genuine issue of fact as to whether a constitutional violation occurred in this case.  Bailey, 736 F.2d at 969 [Courts must evaluate the "totality of the circumstances, including the provocation, the



amount of gas used, and the purposes for which the gas is used [to] determin[e] the validity of the use . . . in the prison environment"]; <u>Plummer</u>, 2010 WL 419927 at * 7, n. 4 [Finding that a discharge of 33.5 grams was a relatively small amount]; <u>see also Whitley</u>, 475 U.S. at 321 [Conduct only actionable where evidence shows it was taken "in bad faith and for no legitimate purpose"]; <u>Whitmore</u>, 2009 WL 900034, at * 9 [Eighth Amendment does not require prison guards to engage in a physical struggle with an inmate if chemical spray can be appropriately used instead].

In sum, while Plaintiff may conceivably have a state law claim he could assert arising from this incident, or some further administrative remedy he can pursue, the evidence before this Court is not sufficient to create a genuine issue of fact as to whether *constitutionally* excessive force was used under the circumstances in this case. <u>Grissom</u>, 2009 WL 2601260, * 6 ["Not every isolated battery or injury to an inmate amounts to a federal constitutional violation"]; <u>Bell v. Wolfish</u>, 441 U.S. 520, 540 (1979) ["[N]ot every malevolent touch by a prison guard gives rise to a federal cause of action"]; <u>see Paul v. Davis</u>, 424 U.S. 693, 701 (1976) [not every claim which may set forth a cause of action under a state tort law is sufficient to set forth a claim for a violation of a constitutional right]; <u>DeShaney v. Winnebago County Dep't of Social Servs.</u>, 489 U.S. 189, 200-203 (1989) [§ 1983 does not impose liability for violations of duties of care arising under state law]; <u>Baker v. McClellan</u>, 443 U.S. 137, 146 (1976) [§ 1983 claim does not lie for violation of state law duty of care]. Therefore, this claim should be dismissed.

### Conclusion

Based on the foregoing it is recommended that the Defendant's motion for summary judgment be **granted**, and that this case be **dismissed**.



The parties are referred to the Notice Page attached hereto.

_____
Bristow Marchant
United States Magistrate Judge

September 14, 2016
Charleston, South Carolina



**Notice of Right to File Objections to Report and Recommendation**

The parties are advised that they may file specific written objections to this Report and Recommendation with the District Judge.  Objections must specifically identify the portions of the Report and Recommendation to which objections are made and the basis for such objections.  "[I]n the absence of a timely filed objection, a district court need not conduct a de novo review, but instead must 'only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation.'"  *Diamond v. Colonial Life & Acc. Ins. Co.*, 416 F.3d 310 (4th Cir. 2005) (quoting Fed. R. Civ. P. 72 advisory committee's note).

Specific written objections must be filed within fourteen (14) days of the date of service of this Report and Recommendation.  28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); *see*  Fed. R. Civ. P. 6(a), (d).  Filing by mail pursuant to Federal Rule of Civil Procedure 5 may be accomplished by mailing objections to:

Robin L. Blume, Clerk
United States District Court
Post Office Box 835
Charleston, South Carolina 29402

**Failure to timely file specific written objections to this Report and Recommendation will result in waiver of the right to appeal from a judgment of the District Court based upon such Recommendation.**  28 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984).

